**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**
-----------------------------------------------------------------x
**TRI-COASTAL DESIGN GROUP, INC.**               :
                                                 :
           **Plaintiff,**               :          **05 Civ. 10633 (HB)**
                                                 :
           **v.**               :          <u>**OPINION & ORDER**</u>
                                                 :
**MERESTONE MERCHANDISE, INC.,**               :
**DOROTHY CAO, and DOES 1-20**               :
                                                 :
           **Defendants.**               :
-----------------------------------------------------------------x
**Hon. HAROLD BAER, JR., District Judge:**

       Plaintiff Tri-Coastal Design Group, Inc. ("Tri-Coastal") brought this action against defendants Merestone Merchandise, Inc. ("Merestone"), Dorothy Cao, and Does 1-20 alleging: (i) false designation of origin and unfair competition in violation of 15 U.S.C. Section 1125(a); (ii) common law trademark infringement; (iii) common law unfair competition; (iv) violation of New York General Business Law Sections 360-1 and 349; (v) copyright infringement in violation of 17 U.S.C. Section 501; and (vi) common law copyright infringement. Merestone and Cao (the "Defendants") now move to dismiss the complaint pursuant to Federal Rule of Civil Procedure 12(b)(2) and (3) or, in the alternative, to transfer venue to the Central District of California under 28 U.S.C. Section 1404. For the reasons set forth below, the Defendants' Rule 12(b)(2) motion is GRANTED and I do not reach the Rule 12(b)(3) ground for dismissal. The action shall be transferred to the Central District of California.

## I. BACKGROUND

       Tri-Coastal is a corporation organized and existing under the laws of the State of New Jersey. <u>See</u> 03/15/2006 Decl. of Michael Mastrangelo, President and Chief Executive Officer of Tri-Coastal ("Mastrangelo Decl.") ¶ 2. The corporation operates principally out of New York and New Jersey, and also maintains a small sales office in California. <u>See id.</u> Tri-Coastal manufactures moderately priced handbags and cosmetic bags, and distributes them to department stores, specialty stores, discount department stores, and mass merchandisers. <u>See id.</u> ¶ 3.

       A division of Tri-Coastal, Loop Design, creates original illustrations and two-dimensional works of art for use on, among other items, handbags and cosmetic bags. <u>See id.</u>

¶ 4.  Two such works created in 2003, entitled CHANDELIER and GEMS (the "Works"), were registered with the United States Copyright Office.  See id.  Tri-Coastal was assigned all rights and interest in the Works, including the Copyrights.  See id.  ¶ 5.  Tri-Coastal uses the Works on handbags and cosmetic bags, and has promoted and sold these bags under its registered trademark, TRANSVERSION, since about May 1, 2004.  See id.

Merestone is a corporation organized and existing under the laws of California.  See 02/24/2006 Decl. of Dorothy Cao, Chief Executive Officer of Merestone ("Cao Decl. I") ¶ 2.  The corporation has its only place of business in Irwindale, California.  See id. ¶ 4.  Merestone designs and sells fashion accessories, and also sells cosmetics.  See id. ¶ 2.  It sells its products to retailers such as J.C. Penney.  See 03/30/2006 Supplemental Decl. of Dorothy Cao ("Cao Decl. II")  ¶ 8.  Dorothy Cao has been the Chief Executive Officer of Merestone since 2002.  See Cao Decl. I ¶ 3.  She resides in California.  See id. ¶ 16(a).

Merestone does not have a bank account, or a subsidiary company, or property in New York, nor does it have a mailing address or designated agent for service of process here.  See id. ¶ 4.  It does not offer any of its products for sale in New York, whether through print, television, radio, the Internet, or other media.  See id. ¶ 5.  Moreover, it has never had an office, showroom, sales agent, factory, warehouse, or other business facility in New York, nor has it ever advertised in, directed advertising at, or maintained any toll free numbers here.  See id.

Merestone maintains a web site located at http://www.merestonegroup.com/.  See Cao Decl. II ¶ 4.  The site lists the corporation's street address, telephone and fax numbers, and its administrative contact person's e-mail address.  See id.  No goods can be purchased or ordered from this web site, nor does Merestone own or maintain any other web site over which its goods can be purchased or ordered.  See id. ¶¶ 4-5.

Contact information for Merestone and some of its officers is also listed on a web page of a web site maintained by a trade show organizer known as ECRM.[1]  See id. ¶ 6; Print-out of Web Page from ECRM Web Site ("ECRM Web Page"), Ex. 2 to 03/31/2006 Defs.' Reply Mem. to Pl.'s Opp'n to Mot. to Dismiss ("Defs.' Reply Mem.").  In addition to the contact information, the web page briefly describes the goods and product lines Merestone sells.  See ECRM Web Page, Ex. 2 to Defs.' Reply Mem.  ECRM requires all attendees of its trade shows to provide it with their contact information and a short description of their products, which it lists at its own

---

[1] The motion papers offer no information as to what the acronym "ECRM" stands for.

discretion on its web site.  See Cao Decl. II ¶ 6.  Merestone does not host, own, or operate the ECRM web site and has no control over its content.  See id.

Merestone products are offered for sale online at web sites operated by third parties such as  J.C. Penney, e-Bay, MSN, and 4 Half Price.  See Print-outs of Web Pages from Third Party Web Sites ("Third Party Web Pages"), Exs. G-J to 03/20/2006 Pl.'s Mem. in Opp'n to Mot. to Dismiss ("Pl.'s Mem.").  Merestone has no ownership interest in these sites, nor did it authorize any sales over these sites.  See Cao Decl. II ¶ 7.  It receives no economic benefit from the sales, and has no knowledge or control of the resale of its goods by third parties over their web sites. See id.  Finally, and for what its worth, the Merestone products sold on these web sites are not the ones at issue in this litigation.  See Third Party Web Pages, Exs. G-J to Pl.'s Mem.

In or about August 2005, Merestone made a one-time sale of handbags printed with designs that were substantially similar to the CHANDELIER and GEMS images (the "Merestone Bags").  See id. ¶¶ 10-11; Color Copies of the Works, Ex. B to Compl.; Color Copies of the Merestone Bags, Ex. C to Compl.  The sale was made to the Marmax Group ("Marmax"), the purchasing arm of the retail chains TJ Maxx and Marshalls, which had approached Merestone to design and manufacture the bags.  See Cao Decl. ¶¶ 10, 13.  The negotiations, design work, payment for, and delivery of the bags to Marmax occurred in California.  See id. ¶ 11. Merestone was unaware that there might be copyright or trade dress issues associated with Marmax's order, nor did it have any reason to believe that Marmax had no right to requisition the bags given their past course of dealing.  See id. ¶ 13.  Further, Merestone, so far as I can determine, had no reason to believe, at any time during its negotiations for the Merestone Bags with Marmax, that these items would be sold in New York.  See id. ¶ 12.  Merestone and Marmax are entirely unrelated corporations, and Merestone derived no economic benefit from Marmax's subsequent resale of the bags.  See id. ¶¶ 10, 15.

In or about the beginning of November 2005, Tri-Coastal purchased a selection of the Merestone Bags at two different New York locations of Marshalls department store.  See Mastrangelo Decl. ¶ 7. On or about November 11, 2005, Tri-Coastal sent Merestone a letter in which it claimed that the bags infringed Tri-Coastal's trade dress and demanded that Merestone cease and desist from selling the bags.  Compl. ¶¶ 13, 15.  Merestone refused to comply, and this action followed.  Id.

## II.  LEGAL STANDARD

On a motion to dismiss for lack of personal jurisdiction pursuant to Federal Rule of Civil Procedure 12(b)(2), the plaintiff bears the burden to demonstrate that the court has jurisdiction. See Whitaker v. Am. Telecasting, Inc., 261 F.3d 196, 208 (2d Cir. 2001).  To resolve the jurisdictional question, the court may rely solely upon the motion papers, allow discovery, or conduct an evidentiary hearing.[2]  See Dale v. Banque SCS Alliance S.A., No. 02 Civ. 3592, 2005 WL 2347853, at *3 (S.D.N.Y. Sept. 22, 2005) (quoting Marine Midland Bank, N.A. v. Miller, 664 F.2d 899, 904 (2d Cir. 1981)).  If, as here, the court chooses to rely on the pleadings and affidavits alone, the plaintiff need make only a prima facie showing of jurisdiction.  See Dale, 2005 WL 2347853 at *3 (citing Robinson v. Overseas Military Sales Corp., 21 F.3d 502, 507 (2d Cir. 1994)).  In other words, the plaintiff need only plead good faith allegations of fact that, if credited, would support jurisdiction over the defendant.  See Whitaker, 261 F.3d at 208.  Further, the court will construe all allegations in the light most favorable to the plaintiff and resolve doubts in the plaintiff's favor.  See id.  Nonetheless, the court may grant the Rule 12(b)(2) motion if the plaintiff's allegations are neither "factually based [nor] intuitively apparent," or if the defendant "affirmatively disprove[s]" the allegations.  Cable News Network, L.P. v. GoSMS.com, Inc., No. 00 Civ. 4812, 2000 WL 1678039, at *3 (S.D.N.Y. Nov. 6, 2000) (citing Stewart v. Vista Point Verlag & Ringier Publ'g, No. 99 Civ. 4225, 2000 WL 1459839, at *4 (S.D.N.Y. Sept. 29, 2000); Mantello v. Hall, 947 F. Supp. 92, 102 (S.D.N.Y. 1996)).

## III.  DISCUSSION

There are two prongs to the inquiry a court must undertake when considering a motion to dismiss for lack of personal jurisdiction.  See Whitaker, 261 F.3d at 208.  The first is whether the exercise of jurisdiction is proper under the applicable statute, and the second, whether such exercise meets the requirements of due process.[3]  See id.  When a case involves a federal question and an out-of-state defendant, federal courts apply the personal jurisdiction rules of the forum state "if the applicable federal statute does not provide for national service of process."

---

[2] In a 12(b)(2) motion, the court may consider matters outside the pleadings without converting the motion to dismiss into one for summary judgment.  See Bensusan Rest. Corp. v. King, 937 F. Supp. 295, 298 (S.D.N.Y. 1996), aff'd, 126 F.3d 25 (2d Cir. 1997).

[3] Because I conclude that the exercise of jurisdiction is not appropriate here, I do not reach the due process question.

Sunward Elecs., Inc. v. McDonald, 362 F.3d 17, 22 (2d Cir. 2004). Neither the Lanham Act nor the Copyright Act provides for national service of process. See id.; Fort Knox Music Inc. v. Baptiste, 203 F.3d 193, 196 (2d Cir. 2000). Here, Tri-Coastal contends that the Defendants are amenable to suit under New York's corporate presence doctrine and long arm statute. See N.Y. C.P.L.R. 301, 302 (McKinney 2001).

### A. N.Y. C.P.L.R. 302(a)(3)(ii)

Tri-Coastal first argues that this Court has jurisdiction under New York Civil Practice Law and Rules Section 302(a)(3)(ii). This section of New York's long arm statute provides for personal jurisdiction over a non-domiciliary that, either in person or through an agent, "commits a tortious act without the state causing injury to person or property within the state," and "expects or should reasonably expect the act to have consequences in the state and derives substantial revenue from interstate or international commerce." N.Y. C.P.L.R. 302(a)(3)(ii) (McKinney 2001). As to the tortious act requirement, the out-of-state act must be the proximate cause of the injury in New York, i.e., the act must be "so close to the injury that reasonable people would regard it as a cause of the injury." Art Leather Mfg. Co., Inc. v. Albumx Corp., 888 F. Supp. 565, 568 (S.D.N.Y. 1995). As to the reasonable expectation requirement, the "test of whether a defendant expects or should reasonably expect his act to have consequences within the State is an objective rather than subjective one." Kernan v. Kurz-Hastings, Inc., 175 F.3d 236, 241 (2d Cir. 1999). The mere "likelihood or foreseeability that a defendant's product will find its way into New York" is insufficient to sustain jurisdiction. Id. (citations and internal quotation marks omitted). "[F]oreseeability must be coupled with evidence of a purposeful New York affiliation, for example, a discernible effort to directly or indirectly serve the New York market" or "purposeful availment of the benefits of the laws of New York such that the defendant may reasonably anticipate being haled into New York court." Id. (citations omitted).

Tri-Coastal contends, without discussion, that the allegations in its complaint "clearly satisfy" the tortious act requirement of Section 302(a)(3)(ii). Pl's Mem. at 6. First, I am not convinced that the Defendants committed "a tortious act without [New York]." In cases of trademark infringement, the tort takes place "where the passing off occurs," that is, where the customer purchases the defendant's goods in the mistaken belief that they are the trademark owner's products. Aerogroup Int'l, Inc. v. Marlboro Footworks, Ltd., 956 F. Supp 427, 433 (S.D.N.Y. 1996) (citing Vanity Fair Mills, Inc. v. T. Eaton Co., 234 F.2d 633, 639 (2d Cir.

1956)). Here, the Defendants cannot be said to have "passed off" the Merestone Bags to Marmax as Tri-Coastal's goods because Marmax, having requisitioned the bags, could not have believed that it was buying Tri-Coastal bags.

Assuming that the Defendants did commit a tortious act outside of New York, Tri-Coastal is correct that its allegation that infringing sales were made in New York is legally sufficient to satisfy the requirement of "injury to person or property within the state." See Art Leather, 888 F. Supp. 565 at 568 (holding that owner of intellectual property rights loses business where infringing sale is made and hence suffers economic injury). Tri-Coastal has failed to establish, however, that Merestone's sale of bags to Marmax in California was the cause of the infringing sales in New York. The facts here are analogous to those in Art Leather, which held that the out-of-state tortious act at issue there "was too remote to be the cause of the injury" within New York. Id. at 568. In Art Leather, the defendant sold its line of allegedly infringing wedding photograph albums to an Illinois distributor that in turn sold the albums to customers in New York. See id. at 566. The defendant did not maintain a place of business in New York, had no employees or agents in the state, never sold its albums in or shipped them into New York, and had not directed or authorized any of its distributors to sell the albums in New York. See id. The court found that the defendant realized no economic benefit regardless of where its Illinois distributor sold the albums, and that the distributor was free to sell the albums wherever it wished. See id. at 568. Consequently, the resales in New York were "not necessarily more likely than sales elsewhere" and the defendant's sale of the albums in Illinois was not the proximate cause of the resales in New York. Id. Here, Merestone has no more contacts with New York than did the defendant in Art Leather. It derived no economic benefit from Marmax's resales of the Merestone Bags, and Marmax was free to resell the bags wherever it wished. These facts support the same conclusion reached in Art Leather.

Finally, I find that Tri-Coastal has also failed to make the requisite prima facie showing that the Defendants expected or should reasonably have expected that Merestone's sale of bags to Marmax in California would have consequences in New York. As to this prong of the Section 302(a)(3)(ii) inquiry, Tri-Coastal offers the following allegations: (i) Marshalls is a nationally recognized department store that publishes its store locations over the Internet; (ii) Marshalls originates all of its purchase orders from its Massachusetts headquarters; (iii) other goods that Defendants sold Marshalls in the past were shipped and sold interstate; (iv) other similar chains,

such as J.C. Penney, sell Defendants' goods throughout the United States; (v) Defendants offer their products to parties such as J.C. Penney, e-Bay, MSN, and 4 Half Price for sale over the Internet; (vi) Defendants advertise and promote themselves over an interactive web site run by ECRM; and (vii) Defendants attested under oath, when filing the in-use affidavit for the mark "JASMINE LA BELLE COSMETICS," that goods displaying this mark were sold and shipped interstate. See Pl.'s Mem. at 7-8.

Tri-Coastal has cast its fish net wide to find these red herrings, but the allegations have either been negatived by the Defendants, or amount to no more than the assertion that the Defendants should have foreseen that the Merestone Bags would find their way into New York, and this, as noted, is not enough.[4]  For example, Cao has attested that the Defendants have not authorized the sales of Merestone products over the J.C. Penney, e-Bay, MSN, and 4 Half Price web sites, have no knowledge or control of the resale of Merestone goods in this manner, and receive no economic benefit from these sales.  In any event, the Merestone products sold over these web sites are not the ones that Tri-Coastal claims infringed its trade dress and copyrights, and so have nothing to do with the tortious act required under Section 302(a)(3)(ii).  Cao has also declared that ECRM posts information about the Defendants on its web site at its own discretion, and that the Defendants do not host, own, or operate that web site, nor have any control over its content.  In light of these statements, Tri-Coastal's claim that the Defendants "advertise and promote themselves" over the ECRM web site is at best inaccurate.  It is also irrelevant, as Tri-Coastal has not alleged how such advertisement and promotion constitutes a tortious act or caused injury in New York.

Tri-Coastal's allegations that the Defendants should have foreseen that the Merestone Bags would find their way into New York because of their past dealings with national retailers such as Marshalls and J.C. Penney are insufficient to demonstrate that the Defendants sought a purposeful affiliation with New York as is required under Section 302(a)(3)(ii).  Several New York Appellate Division cases illustrate the "purposeful affiliation" factor as it relates to fact patterns, such as that here, that involve a foreign defendant which sells goods to an out-of-state distributor who in turn introduces the goods into New York.  In the first case, Schaadt v. T.W.

---

[4] I do not address the allegation that Marshalls originates all its purchase orders from Massachusetts as Tri-Coastal has not explained how this fact has any bearing on whether a court in New York may exercise personal jurisdiction over the California defendants.

Kutter, Inc., the Third Department granted a German defendant's motion for summary judgment for lack of personal jurisdiction because it found that the defendant had no purposeful affiliation with New York. See id., 564 N.Y.S.2d 865, 865-66 (N.Y. App. Div. 1991). The court found that the defendant's sole contact with New York was that it sold its machines to a Massachusetts corporation that resold the machines throughout the United States, including in New York. See id.

In the second case that involved the same defendant, Kappas v. T.W. Kutter, Inc., the First Department reached a different result. See id., 596 N.Y.S.2d 361, 362 (N.Y. App. Div. 1993). The First Department found that there were issues of fact as to whether, subsequent to the operative events in Schaadt, the German defendant had designated the Massachusetts corporation its exclusive distributor in the United States and contracted with it to repair and service machines sold in New York. See id. at 362-63. If so, the defendant should have expected its machines to make their way to New York. See id. Similarly, in Adams v. Bodum, Inc., the First Department found that a foreign manufacturer's exclusive distributorship agreement with a distributor to sell its products throughout the United States, including in New York, was a sufficient basis to conclude that the manufacturer should have reasonably expected that its products would be sold in New York. See id., 617 N.Y.S.2d 316, 316 (N.Y. App. Div. 1994). Following these cases, the Second Circuit affirmed jurisdiction over a Japanese corporation that sold printing presses to a Pennsylvania corporation that in turn sold the machines in New York, but acknowledged that it was "a close question." Kernan v. Kurz-Hastings, Inc., 175 F.3d 236, 242 (2d Cir. 1999). The Circuit found that the Japanese corporation indirectly attempted to serve the New York market because it had an "exclusive sales right" agreement with the Pennsylvania corporation that allowed the latter to sell its presses anywhere outside of seventeen specified Asian countries, and provided for the exchange of product development and pricing information. See id.

The present case is more like Schaadt than Kappas, Adams, and Kernan. Significantly, Tri-Coastal has not alleged that the Defendants had anything like an exclusive distributorship, service, or information exchange agreement with Marmax. Indeed, Cao has attested that the sale of the Merestone Bags to Marmax was a one-time event, and that Merestone derived no economic benefit from Marmax's resale of the bags. Accordingly, Tri-Coastal has not established a prima facie case that the Defendants sought a purposeful affiliation with New York such as to satisfy the reasonable expectation requirement of Section 302(a)(3)(ii).

8

**B.** **N.Y. C.P.L.R. 301**

Next, Tri-Coastal seeks to ground jurisdiction on New York's corporate presence doctrine, New York Civil Practice Law and Rules Section 301. Under Section 301, a foreign defendant is subject to general personal jurisdiction in New York if it is "doing business" in the state "with a fair measure of permanence and continuity." Wiwa v. Royal Dutch Petroleum Co., 226 F.3d 88, 95 (2d Cir. 2000) (quoting Tauza v. Susquehanna Coal Co., 115 N.E. 915 (N.Y. 1917)). A defendant may be found to be "doing business" in New York within the meaning of Section 301 if it "maintains an interactive web site which permits the exchange of information" between users in New York and the defendant, "depending on the level and nature of the exchange." Citigroup Inc. v. City Holding Co., 97 F. Supp. 2d 549, 565 (S.D.N.Y. 2000).

Tri-Coastal contends that jurisdiction under Section 301 is proper here because the Defendants "knowingly sell their products over the [I]nternet." Pl.'s Mem. at 12. Again, Tri-Coastal points to the J.C. Penney, e-Bay, MSN, and 4 Half Price web sites, and repeats that Merestone "purposely promotes" its business over the ECRM web site. As discussed in Section III.A supra, the Defendants have disproved these allegations. Accordingly, Tri-Coastal has failed to make a prima facie case under Section 301.

**C.** **N.Y. C.P.L.R. 302(a)(1)**

Finally, Tri-Coastal contends that jurisdiction is proper under New York Civil Practice Law and Rules Section 302(a)(1). This section allows the court to exercise personal jurisdiction over a non-domiciliary that "transacts any business within the state or contracts anywhere to supply goods or services in the state." N.Y. C.P.L.R. 302(a)(1) (McKinney 2001). The foreign defendant must have "purposely availed [himself] of the privilege of conducting activities within New York and thereby invoked the benefits and protections of its laws." Bank Brussels Lambert v. Fiddler Gonzalez & Rodriguez, 171 F.3d 779, 787 (2d Cir. 1999) (citation omitted). Factors that a court should consider in determining whether a foreign defendant transacts business in New York include: "(i) whether the defendant has an on-going contractual relationship with a New York corporation; (ii) whether the contract was negotiated or executed in New York . . .; (iii) what the choice-of-law clause is in any such contract; and (iv) whether the contract requires franchisees to send notices and payments into the forum state or subjects them to supervision by the corporation in the forum state." Sunward Elecs., Inc., 362 F.3d at 22. The court's decision must be based on the totality of the circumstances. See id. at 23.

In support of its assertion that the Defendants are subject to suit under Section 302(a)(1), Tri-Coastal only reiterates the same allegations it made in relation to Section 302(a)(3)(ii), namely, that the Defendants should have known through their history of dealing with national retailers that their goods would find their way into New York, and that their infringing products were in fact sold in New York. See Pl.'s Mem. at 13-14. As discussed in Section III.A supra, these allegations are insufficient to show that the Defendants purposely sought to conduct activities in New York or to avail themselves of the benefits and protections of New York law. The paucity of Tri-Coastal's allegations pertaining to Section 302(a)(1) does not direct a finding that this Court should exercise jurisdiction over the Defendants under this section.

**D.     Transfer**

Regardless of whether venue is proper, a court that lacks personal jurisdiction over the defendant may still transfer the case to any district in which the action could have been brought rather than dismiss if such transfer would be "in the interest of justice." Corke v. Sameiet M. S. Song of Norway, 572 F.2d 77, 80 (2d Cir. 1978); see Hatfield v. Asphalt Int'l, Inc., No. 03 Civ. 1372, 2004 WL 287680, at *4 (S.D.N.Y. Feb. 11, 2004). "The decision to transfer 'lies within the sound discretion of the district court.'" Hatfield, 2004 WL 287680, at *4 (quoting Minnette v. Time Warner, 997 F.2d 1023, 1026 (2d Cir. 1993)).

Here, the action could have been brought in the Central District of California as that district has personal jurisdiction over the Defendants and venue is proper there. See 28 U.S.C. § 1391(b) (2006) (providing that civil action not based on diversity may be brought in "a judicial district where any defendant resides, if all defendants reside in the same State"); Cal. Civ. Proc. Code § 410.10 (West 2006). Transfer in this case would serve the interest of justice because Tri-Coastal would be spared the expense of time and money required to file a new action in a new forum, and the Defendants would benefit by having the case transferred to a district where their business operations, witnesses, and documents are located. See Hatfield, 2004 WL 287680, at *5. Accordingly, under the Second Circuit's decision in Corke, I find that it is proper to transfer this action to the Central District of California.

## IV. CONCLUSION

For the reasons set forth above, this Court lacks personal jurisdiction over the Defendants and accordingly orders that, in the interest of justice, this case be transferred to the United States District Court for the Central District of California. The Clerk is instructed to forward the file to the clerk in that district and to close this motion and remove this case from my docket.

**SO ORDERED.**
**New York, New York**
**May ____, 2006**

U.S.D.J.